JELA CHENEY vs. GREEN H. DUKE.—*December*, 1838.

Under the act of 1817, ch. 112, to prevent the unlawful exportation of ne-groes and mulattoes, and to alter and amend the laws concerning runaways, it is the duty of the purchaser to procure and have recorded, the bill of sale required by the fourth section.

The mere omission of the vendor to give a bill of sale, will not prevent his maintaining an action for the purchase money, though he knew at the time of the sale that the purchaser intended to remove the negro sold beyond the limits of the state.

The mere fact of knowledge alone, of the illegal purpose in the mind of the purchaser, unaccompanied by any aid in furtherance of its execution, will interpose no bar to the recovery of the purchase money.

To deprive the seller of goods, of his right to sue for the purchase money, it is not sufficient that he knows that the buyer will make an illegal use of them. To affect him, it must be shewn that he was a sharer in the illegal transaction, or that he aided and assisted in its execution.

APPEAL from *Frederick* county court.

THIS was an action of *assumpsit*, brought on the 3d May, 1836, by the appellant against the appellee, to recover the price of a negro slave sold by the appellant to the appellee. The defendant pleaded the general issue, &c.

At the trial of the cause, the plaintiff gave in evidence to the jury, by competent testimony, that she being the owner of a certain negro man, a slave for life, named Harry, and being the slave mentioned in the declaration, sold the said

negro man to the defendant by parol, on the 1st May, 1836, at, and for the price, and sum of $650, and that the defendant thereupon paid the sum of $100, in part of the purchase money, and that plaintiff delivered said negro man to said defendant, under and in pursuance of the said sale by parol, and that the defendant took him into possession, and exercised acts of ownership over him as his property. It was also proved by competent testimony, that the defendant was then engaged in the purchasing of slaves, for the purpose of exporting them beyond the limits of this state, and that he was known to the plaintiff to be so engaged; and also, that he purchased said slave for the purpose of exporting, and removing him beyond the limits of the state of Maryland, and that the plaintiff in making such sale knew that he was purchasing said slave, with intent, and for the purpose of exporting and removing said slave beyond the limits of the state. It was further admitted, that no bill of sale was executed and delivered by the said plaintiff to the said defendant for the said negro, nor was any thing said between the parties, in relation to any bill of sale for said negro. It was further admitted, that the said plaintiff then resided, and still resides in *Washington* county, and that the defendant then resided and still resides in *Frederick* county. The defendant thereupon, by his counsel, prayed the court to instruct the jury, that if they shall believe, from the evidence in the cause, that the defendant purchased said negro man with intent, and for the purpose of removing him beyond the limits of the state, and that the plaintiff at the time of selling and delivering said negro man, knew that the defendant intended to remove said negro man beyond the limits of the state, and shall further believe, that no bill of sale for said slave was executed and delivered by the said plaintiff to the said defendant, that then the plaintiff is not entitled to recover in this case, upon the ground that no bill of sale was executed as required by the 4th section of the act of 1817, chapter 112, of which opinion the court (*Shriver* and *T.*

*Buchanan, A. J.*) were, and so instructed the jury. The plaintiff excepted.

The plaintiff then, by her counsel, upon the facts stated in the first bill of exceptions, which is to be taken and considered as if stated in this bill of exceptions, prayed the opinion of the court, and its instruction to the jury, that if they shall believe, from the evidence in this case, that the plaintiff sold the slave mentioned in the declaration to the said defendant, for the price of six hundred and fifty dollars, one hundred dollars of which was paid to the said plaintiff by the said defendant at the time of the contract, and that in pursuance of said contract, the said plaintiff delivered the said negro to the said defendant, and that the said defendant took and exercised acts of ownership over said slave, as his property, that then the said plaintiff is entitled to recover, although they shall believe that no bill of sale was given for said slave, and that the said plaintiff knew at the time of the said contract, that the said defendant intended to transport and remove him beyond the limits of the state, without obtaining a bill of sale; provided, they shall also believe, that the said plaintiff, was in no otherwise, than as above stated, acting or assenting to the intended transportation and removal of said negro.

But the court refused to grant the said last mentioned prayer, or to give the said instruction. The plaintiff excepted.

The verdict and judgment being against the said Jela Cheney, she prosecuted the present appeal.

The cause was argued before BUCHANAN, Ch. J., STEPHEN, ARCHER, DORSEY, CHAMBERS and SPENCE, Judges.

By J. M. COALE, for the appellant:

Two questions arise in the consideration of this case: 1. Is the contract void under the 4th section of the act of 1817, ch. 112, because no bill of sale was taken for the slave purchased, as is prescribed by that section? 2. If by the

sale and delivery, title passed to the vendee without bill of sale, is the plaintiff debarred from recovering on account of illegality in the consideration?

In construing statutes, the intention of the framer is the supreme and controlling guide to their true interpretation. "A thing which is in the letter of a statute, is not within the statute, unless it be within the intention of the makers." *Bacon's Abr. title Statutes*, 1. *Dwarris on Statutes*, 9 *Law Library*, 39, &c. 4 *Gill and John.* 152. Was it then the *intention* of the framers of the act of 1817, ch. 112, to make a sale, as proved in the case at bar, void without a bill of sale?

The subject of contracts and the modes by which they shall be consummated, being matters of universal and every day concern to the great body of a people, are seldom touched for slight and transient causes, by the law making power, and whenever the suppression of an evil, or the advancement of the public welfare, requires restrictions to be placed upon them, the legislature expresses its purpose and intent, in plain and unambiguous language. When it speaks of a contract, and means to make it void and of no effect, without certain prescribed requisites, it always says so in *totidem verbis.*

In support of this position, I refer to the great original innovator on the common law of contracts, the 29th Chas. 2, ch. 3, as also to the acts of assembly of this state, from the earliest period of provincial legislation down to the present day. 1715, ch. 47, sec. 8; 1729, ch. 8, sec. 5; 1763, ch. 13, sec. 2; 1766, ch. 14, sec. 2. Even the act of 1817, ch. 112, upon which the defendant relies as a defence to this action, affords a pregnant illustration of this view of the subject. By the first, second, and third sections of the act, the framers of it intended to prohibit, under any circumstances, the sale of a slave for a term of years, to a southern trader, and to make void a contract for such slave between citizens of the state without a bill of sale, and they have made known that intention by emphatic prohibitions, and clear and

repeated terms of avoidance. But in the fourth section, which relates to slaves for life, there is no language of prohibition, no making void without a bill of sale—no penalty imposed upon the contract, and no declaration that title shall not pass unless upon the observance of a specific formality. There is nothing more than a mere admonition to the purchaser, that when " he shall purchase any slave or slaves within this state for the purpose of exporting or removing them beyond the limits of the state, it shall be *his duty* to take a bill of sale," &c.

The inference is then irresistible that the legislature did not intend to render the sale of *a slave for life void*, without a bill of sale. " For when the legislature in the same sentence uses different words, the courts of law will presume that they were used in order to express different ideas." *Rex. vs. Bolton*, 8 *B. & C.* 74. " So if there is a material alteration in the language used *in the different clauses*, it is to be inferred that the legislature knew how to use terms applicable to the subject matter. The several inditing and penning of the different branches" said the judges in Edrick's case, " *doth argue that the maker did intend a difference of the purview and remedies.*" *Dwarris on Statutes*, 707. 5 *Rep.* 119. " Further as a rule of exposition, statutes are to be construed in reference to the principles of the common law. For it is not to be presumed that the legislature intended to make any innovation upon the common law further than the case absolutely required. The law rather infers that the act did *not* intend to make any alteration other than what is specified, and besides what has been plainly pronounced; for if the parliament had had that design, it is naturally said *they would have expressed it.*" *Dwarris on Statutes*, 695.

The provision contained in the fourth section of the act was inserted merely as a warning to the purchaser, and the bill of sale therein directed to be taken, was provided for his protection against the forfeiture imposed by the fifth section of the act. It is not prescribed as essential to the contract of sale, but is a thing subsequent and subordinate to it. If

the vendee, intends to export the slave, the law tells him to take a bill of sale, otherwise he will incur the risk of forfeiture. The language of this section is purely *directory*, and the contract of sale is good and binding, notwithstanding the direction is disregarded. *Rex, vs. Birmingham*, 8 B. & C. 29, quoted in *Dwarris on Statutes*, 9 *Law Library*, 56.

If then a bill of sale was not essential to the perfection of the contract proved in this case, and it was *not intended* by the framers of the act to make such sale void without it, the plaintiff is entitled to recover, no matter what may be the penalty or forfeiture imposed by any subsequent clause of the act. But waiving this conclusion, I will proceed to inquire, whether there be any iron rule of construction which can defeat our just rights of payment for the property sold, under the fifth section of the act. This inquiry is embraced under the second proposition laid down at the commencement of the argument, and appertains to the prayer in the second bill of exceptions. The sale in this case is clearly not tainted with that kind of illegality which will defeat the plaintiff's right to recover. She has in the act of contract and the delivery of the slave done nothing that the law prohibited, nor omitted to do any thing that the law required of her, to the completion of the contract. Neither has she done any thing in contravention of the spirit of the law, for the *bona fide* sale of a slave for life, to a person who purchased to remove him out of the state, was never intended to be prevented by the act of 1817, ch. 112. The mischief which the law was made to remedy *is particularly specified in the preamble of the act, and it does not embrace this case.* Even if it was illegal for the purchaser to remove beyond the limits of the state the slave for life *bona fide* purchased by him without his taking a bill of sale, and the vendor, the plaintiff in this case, knew at the time she sold and delivered said slave that he intended so to remove him, still she is entitled to recover, inasmuch as she in no wise aided or contributed towards such removal, nor was in any respect a sharer in the transaction. *Long on Sales*, 85. *Hodgson vs. Temple*, 5 *Taunton*, 181. *Johnson*

*vs. Hudson*, 11 *East.* 180. *Brown vs. Duncan*, 21 *En. Com. Law Rep.* 29. *Bowry vs. Bennet*, 1 *Camp. Rep.* 348. 1 *Holt. N. P. C.* 107, *note. Ross on Vendors*, 12 *Law Lib.* 166–170. *Wetherall vs. Jones*, 3 *Bar. & Adol. quoted in Smith on Mercantile Law*, 17 *Law Library*, 188.

In the last mentioned case, Lord Tenterden takes a broad and liberal view of the whole subject of illegal sales, and lays down fixed and comprehensive rules and principles for their construction. He says, "where a party seeks to enforce a contract which is expressly or by implication forbidden by the statute or common law, no court will lend its assistance to give it effect; and there are numerous cases in the books in which an action on the contract has failed, because either the consideration for the promise, or the act to be done, was illegal, as being *against the express provisions of the law, or contrary to justice, morality, or sound policy. But where the consideration and the matter to be performed are both legal, we are not aware that a plaintiff has ever been prevented from recovering, by an infringement of the law not contemplated by the contract, in the performance of something to be done on his part.*"

In this decision the learned judge has extracted from the various cases of illegal sales the essential principle that governed them, and has laid down the unquestionable conclusions to which all of them tend, as established law. A contract to be void must be expressly *prohibited or declared to be void*, or be "*contrary to justice, morality, or sound policy.*"

The contract in this case is not expressly prohibited nor made void, nor is it contrary to justice or morality, because negro slavery is sanctioned by religion, and is in conformity to the constitution and laws, and contracts in relation to slaves are warranted by the same high authorities. Neither is the sale of the slave as made by the plaintiff to the defendant contrary to sound policy. It has been the settled policy of the state of Maryland for the last thirty years to get rid of her black population by all the means that could rightfully be

resorted to. The legislature of the state has passed laws authorizing their transportation for crime, instead of other punishment. 1809, ch. 138. 1818, ch. 197. 1819, ch. 159. Nor can it be said that these provisions are adopted only to cast off the vicious. They are not extended to the white offender however criminal he may be. So by the act of 1831, ch. 281, a direct tax is imposed upon the people of the state to defray the expenses of transporting free or manumitted blacks, and by 1831, ch. 323, the introduction of slaves from other states or elsewhere into this state is emphatically prohibited, and every person who offends against this provision of the law is subject to indictment, and the slave is forthwith expelled from our borders. And so fixed is this policy, that the legislature, year after year, have refused permission, upon the most urgent applications for a special law, to bring into the state slaves that accidentally came into the ownership of a citizen of the state by marriage or otherwise. The policy of the state to relieve herself of the evils of her black population has been, I repeat, for a long series of years settled, permanent, unwavering, and inexorable. The *bona fide* sale of a slave for life then to be removed beyond the limits of the state, so far from being against "sound policy" is in perfect unison with the most cherished policy of the state. A restriction upon or interference with this policy was never contemplated by the act of 1817, ch. 112.

" The consideration then and the matter to be performed," are both legal, and in the language of Lord Tenterden, a plaintiff under those circumstances, "has never been prevented from recovering," &c.

There is not, strictly speaking, any evidence in this case that the act of 1817, ch. 112, was ever violated even by the defendant, so as to incur the forfeiture. The slave was never taken out of the state, and nothing is proved but that the purchaser bought with *intent* to remove him. This is no offence. By the act of 1817 there is a *locus penitentiæ* provided after the purchase, and if the purchaser changes his

intention and determines to keep the slave in the state, he is his to all intents and purposes, and even the arm of the sovereign power of the state cannot wrest him away. The inquiry and forfeiture can only take place where the purchaser has the slave in one of the counties of this state, and after " affidavit made that *he is about to remove him contrary to law.*" If he changes his mind after purchasing and is *not* about to remove him, no affidavit can be made, and no forfeiture can take place. But even if he persists in his intention of removal, the law will presume, if it be necessary, to sustain the contract, that in that period, which is allowed as a *locus penitentiæ* he will provide all the requisites prescribed for a lawful removal. *Haines vs. Busk,* 5 *Taunton,* 521. 4 *Taunton,* 856. In every view of this case then, as it is presented in the bill of exceptions, the plaintiff is entitled to recover. A contrary construction would make the act of 1817, ch. 112, which was passed among other things for the protection of the slave-owner, a most potent instrument of fraud and imposition in the hands of the slave-dealer, and would cause it to be much more prolific in producing mischief, than efficacious in preventing it.

W. SCHLEY, for the appellee.

There are three counts in the declaration. The first relates to a special contract, and avers performance. The second and third are *indebitatus assumpsit,* and rely on an executed contract. In all it is said, the plaintiff had sold and delivered a negro man to the defendant. Part of the argument has turned on the meaning of the word sale. What constitutes a valid and effectual sale? The term sold, as used here, implies a contract. It is to be understood according to the subject matter. In cases where there can be no contract without writing, the general term in a declaration, means a written contract. If it appeared in the declaration, that the purchaser was a foreign dealer, then the contract should have been pleaded to be a written contract. But here it must so appear in proof, and I contend that is necessary to make a valid sale. 1 contend:

1. The averment of a sale is not gratified unless there was a bill of sale.

, 2. That on the part of the buyer and seller the contract was in contravention of the act of 1817. Both violated the law.

· 3. Even if a sale by parol operated to sustain the allegation of sold and delivered, and there was no actual violation of law on the part of the plaintiff—yet if she knew the slave sold was intended to be exported without a bill of sale, she was an aider and abettor of a course of dealing against the policy of the law.

The word sale, imports a contract *ex vi termini;* a transmutation of property from vendor to vendee. 2 *Chit. Plea.* 55. *Emery vs. Fell,* 2 *Term. Rep.* 30. 12 *Law Lib.* 1. Upon a sale there must be a delivery—a legal sale and delivery, so that each may have his action, one for the price— one for detainment or trover. Each must have a remedy. If not, neither could have it. A sale by parol in this case, could not legally produce these results.

Matters of evidence need not be alleged, but must appear in proof—the mode of proof must conform to the law. 2 *Chit. Plea.* 253, *note. Ross on Vendors,* 288. Under the act of 1817, there could be no transmutation to a negro trader unless by bill of sale. Its true interpretation is involved. The three first sections apply to servants or slaves for a term of years only. The 4th and 5th sections apply to slaves purchased for exportation. The *first* section has nothing to do with the manner of the sale. It operates upon the vendor and prohibits a sale to non-residents. Even if the vendee is innocent, guilt on the part of the vendor forfeits the slave.

The *second* section applies to vendee, and prohibits a purchase under a penalty. It applies to non-residents, and on conviction the sale is avoided. If its formalities are wanting no title vests.

The *third* section applies exclusively to sales to residents.

The act was intended to protect slaves and masters. The evidence of transfer of slaves for years was to be put on

record. Taking the 4th and 5th sections together, they comprehend the same principles as to slaves for life, as the 3d section in regard to slaves for terms of years. There is no prohibition of a sale, in terms, without a bill of sale, but the spirit and intent of law clearly require it. The act is to be construed together. The act considers that a negro may be sold as a slave for life, who was not a slave, or only a slave for a term : and intended to confine sales of slaves for life without a bill of sale to sales for the county of their residence.

The 4th section was not for the benefit of the purchaser, but was intended for the protection of the negro. It meant to prohibit secret sales. Its language is more than directory. It is made the duty to take a bill of sale. It is a part of the *res gestæ.* The acknowledgment is a part of the vendor's contract. No doubt it is the duty of the vendee to record the sale. His neglect in such a case is not of a duty directed, but of a duty prescribed for the completion of his title, which the law requires.

It concerns the public to have the marks and descriptions of slaves intended for exportation. These facilitate the discovery of crime, and the restoration to owners of their lost property.

What was the law before the act of 1817. Sales without stint might be made of slaves for terms to non-residents. Now non-residents cannot buy. It would be idle to require a bill of sale, to be registered, as a means of preventing infractions of a law—if a title can be acquired without it.

Neither prayer could prevail, if the title does not pass—for the law is the same on both counts of the declaration.

I insist that the act of 1817 made it the duty of both contracting parties to execute a bill of sale, and see to its being recorded. The 4th section relates to both buyer and seller—both knew the fact of intended exportation—both equally guilty.

A sale to aid an illegal use is void, a sale of poison to one intending to destroy his wife is void. *Lightfoot, et al, vs.*

*Tenant*, 1 *Boss. & Pull.* 551. One who is part and parcel of the violation cannot recover, 1 *Law Lib.* 12. The vendor must do some act to promote, intending to promote the illegal use. .Thus he acts against public policy and cannot recover the consideration of his contract.

PALMER, in reply:

Under the statute of frauds, where there has been a delivery of goods sold, no memorandum is necessary. It dispenses with the writing, and hence the cases under that statute cited do not apply here. The price of a ship sold and delivered may be recovered without register. Is the contract at law void, then in chancery the plaintiff would be bound to give a bill of sale. The act in question grew out of the uneasiness of some persons about slavery, and the 4th section was intended to reach the people of Maryland, to protect free persons and slaves from kidnappers and negro buyers and stealers. It was a guard to this special end;—such is its policy. The common law is, that property passes by delivery. The act was to restrain an evil under special circumstances, not designed to alter the law of sale, 9 *Law Lib.* 43, 50. Changes of the common law, are affected by express words—as in the 1st and 2d sections. I am at a loss to ascertain the extent of the 4th section except that it was directory. The proviso in the 5th section shows that it is not applicable to residents who designed to transport their slaves. If right in this construction, what is required? No penalty is fixed by the law. The vendee who successfully prosecutes his purchase, keeps his money and refuses to pay. The court will so construe the law to advance fraud. Where a statute prohibits an act under a penalty, a contract to do the act is not void, though the party be subject to the penalty. The rule refers to contracts illegal or wrong as simoniacal contracts, *Johnson, et al, vs. Hudson*, 11 *East.* 180. *Gremare vs. Le Clerc Bois Valon*, 2 *Camp.* 144. But in other cases, as that no person shall carry on two trades at the same time, under a penalty. The mere sale of goods with knowledge

that they were to be used in the prohibited calling, does not prevent the recovery of the price.

It may and ought to be implied that as the plaintiff knew the defendant was about to transport the negro, that he would also apply for a bill of sale within twenty days.

STEPHEN, Judge, delivered the opinion of the court.

The decision of the question involved in this case, mainly depends upon the true contruction of the 4th and 5th sections of an act of assembly, passed by the legislature of this state in the year 1817, ch. 112, entitled, " an act to prevent the unlawful exportation of negroes and mulattoes, and to alter and amend the laws concerning runaways."

The suit was brought to recover the price in part of a slave for life, sold by the appellant to the appellee. A part of the purchase money was paid, and the slave delivered to the purchaser, pursuant to the terms of the contract of sale, and it is admitted, for it could not be denied, that apart from the supposed operation of the act of assembly, the sale was a valid one, both at common law, and under the provisions of the statute of frauds and perjuries. The right of the plaintiff to recover must consequently depend upon the true construction of the provisions of the above mentioned act, and the intention of the legislature, designed to be accomplished by its enactment.

The *fourth* section provides that, whenever any persons shall purchase a slave within this state, for the purpose of exporting or removing the same, beyond the limits of this state, it shall be the duty of the purchaser to take from the seller a bill of sale for said slave, in which the age and distinguishing marks, as nearly as may be, and the name of such slave, shall be inserted ; which bill of sale is to be acknowledged, and recorded, within twenty days, in the county where the sale shall be made ; and it is made the duty of the clerk, on demand, to deliver to the purchaser a copy of such bill of sale, with a certificate endorsed thereon, under the seal of the county, that the same has been duly recorded.

This certificate required to be delivered to the purchaser when demanded by him, was manifestly intended by the law to be a muniment of title for the benefit of the purchaser, and to protect his interest in the property purchased.

The *fifth* section provides for a sale of any slave for the benefit of the county, which shall be purchased in violation of the provisions of the *fourth* section, after a judicial investigation into the circumstances, shall be had by the proper tribunal invested with jurisdiction for that purpose.

The first inquiry which a correct decision of this question would seem to suggest is, upon whom does the law impose the duty of complying with its requirements, in taking and causing to be acknowledged and recorded, the bill of sale, as an evidence of title? This question is answered by the explicit, and unequivocal provisions of the *fourth* section, which emphatically declares it to be the duty of the purchaser,—no such duty is, in terms at least, imposed upon the seller. He then is not in default by omitting to give, but the purchaser by omitting to take the bill of sale as directed by the law. For this omission the law is penal in its effects, and inflicts a forfeiture of title,—the question then arises, on whom ought the forfeiture to fall, and the penalty of losing the right of property to be inflicted? Common justice, and common sense would seem to dictate, not on the innocent vendor, who has done nothing in contravention of the law, but on the guilty purchaser, who has acted in culpable defiance of its provisions. But it has been contended on the part of the purchaser, that this suit for the purchase money cannot be sustained, if the seller knew at the time of the sale, that the purchaser of the negro slave, intended to remove him beyond the limits of this state, without taking a bill of sale, as an evidence of the transfer of title, which it is supposed in such case it was the duty of vendor to give, as well as the duty of the vendee to take, according to the true and sound interpretation of the act of assembly. This court is not of that opinion; and we shall look in vain for any countenance to such a proposition to be found in the law, which

we are now called upon to expound. So far as the perform-ance of such a duty is enjoined or required, the vendor, we think, might well be passive, as the law makes it in terms the duty of the purchaser alone. If then, the true ex-position of the law, did not impose it as a duty upon the vendor, to execute and deliver to the purchaser a bill of sale, with such knowledge of his intention, was such sale so far contaminated, and rendered illegal by such knowledge alone, as to bar his right to recover the purchase money? We think not; and such seems to be the principle of the decisions referred to in the argument. The naked fact of knowledge alone, of the illegal purpose existing in the mind of the ven-dee, unaccompanied by any aid in furtherance of its execu-tion by the vendor, would, we think, interpose no such bar.

The act of assembly in none of its provisions vacates the contract of sale; it only requires the bill of sale to be taken by the purchaser as an evidence of title, where the purchase is made with intent to remove the slave beyond the limits of this state. The sale itself not being rendered illegal and void, no obstacle can exist to the recovery of the purchase money, unless it arises from the fact of a knowledge on the part of the vendor, of the illegal purpose contemplated by the vendee, at the time the purchase was made, and when nothing is done by the vendor, in aid, or furtherance of the attainment of such illegal design. That knowledge alone by the vendor, without any participation in the accomplishment of the illegal, or prohibited purpose by the vendee, will not close against him the doors of a court of justice, when seek-ing to recover his purchase money, is we think, abundantly proved by the judicial decisions referred to in the course of the argument. These principles are established by several cases referred to in *Comyn on Contracts*, 64, where he says, " where the defendant an Englishman, living in England, contracted with the plaintiff a foreigner, living at *Lisbon*, for a quantity of lace, which the plaintiff knew was to be smug-gled into England, and the plaintiff for that purpose, had it packed in a particular manner by the direction of the defen-

dant, for the more easy conveyance of it into England, without a discovery, the court held that the contract was void, and that the plaintiff could not recover the value of the goods." In that case it is manifest that the court pronounced the contract to be invalid, and defeated the attempt to recover the purchase money, on the ground that the plaintiff was a party to the fraud attempted to be practised upon the revenue laws of the country in which the suit was instituted. He was aiding and assisting in the unlawful importation, by facilitating the means of perpetrating the fraud, and therefore, could not receive the countenance of a court of justice. But in the same book, and at the same page, it is said, that the merely selling goods, knowing that the buyer will make an illegal use of them, is not of itself sufficient to deprive the vendor of his right of payment, but to affect him, it is necessary to shew that he is either a sharer in the illegal transaction, or that he aided and assisted in the act of smuggling. Thus in the case of *Holman vs. Johnson*, where it appeared that the plaintiff residing at *Dunkirk*, sold and delivered a quantity of tea, for the price of which the action was brought, to the order of the defendant, knowing it was intended to be smuggled into England; but the plaintiff had no concern in the smuggling himself, it was held by the court of *King's bench*, that this was a legal contract, and that an action might be supported on it;—and *Lord Mansfield*, in giving judgment, lays it down, that if goods are sold abroad to be delivered in *England*, where they are prohibited, the contract is void, and the buyer shall not be liable to an action for the price, because it would be an inconvenience, and prejudice to the state. If such an action could be maintained, and the cases in *Cowper*, 341, *and Hodgson vs. Temple*, 5 *Taunton*, 181, are referred to as supporting these principles. In the case put by Lord Mansfield, the vendor was a sharer in the illegal transaction, because the goods were to be delivered in *England*, where they were prohibited, and therefore the law would not assist him in the recovery of the price to be paid for the goods brought into *England*, in violation of a legal

prohibition. The same principle is asserted, and to be found in a note in the *3rd English Com. Law Rep.* 43, where it is said, a person who sells goods, knowing that the purchaser intends to apply them in an illegal trade, is nevertheless entitled to recover the price, if he yields no other aid in the illegal transaction, than selling the goods, and procuring permits for their delivery to the agent of the purchaser. To deprive the vendor of his just right of payment, (says Mansfield, chief justice,) it is necessary he should be a sharer in the illegal transaction, and in support of this doctrine, the case of *Hodgson vs. Temple*, 5 *Taunton*, 181, is also referred to. These decisions, we think, abundantly shew that the facts stated in the bills of exception in this case, if true, interposed no obstacle to the plaintiff's recovering, and that the judgment of the court below was therefore erroneous, and ought to be reversed.

JUDGMENT REVERSED AND PROCEDENDO ORDERED.